UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARK GEORGE KREJCI,

       Plaintiff,

v.                                                                  Case No:  2:15-cv-193-FtM-CM

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____

## OPINION AND ORDER

Plaintiff Mark George Krejci appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for disability insurance benefits ("DIB") and supplemental security income ("SSI").  For the reasons discussed herein, the Commissioner's decision is **REVERSED and REMANDED**, pursuant to 42 U.S.C. § 405(g), sentence four.

### I.    Issues on Appeal

Plaintiff raises three interrelated issues on appeal: [1] (1) whether Administrative Law Judge M. Dwight Evans (the "ALJ") erroneously determined at step two that Plaintiff's traumatic brain injury ("TBI") is not a medically determinable impairment ("MDI"); (2) whether the ALJ properly evaluated Plaintiff's

---

[1] Any issue not raised by Plaintiff on appeal is deemed to be waived. *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed."), *cited in Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013).

treating and consultative physician's opinions and (3) whether substantial evidence supports the ALJ's credibility determination.

## II.    Procedural History and Summary of the ALJ's Decision

On January 28, 2011, Plaintiff filed applications for a period of DIB and SSI alleging that he became disabled and unable to work on January 15, 2011 due to traumatic brain injury and a right hand injury resulting from a motorcycle accident in which Plaintiff was not wearing a helmet.   Tr. 12, 17, 176, 180, 206, 210.   The Social Security Administration denied his claim initially and upon reconsideration. Tr. 12, 106-118, 121-34.   Plaintiff requested and received a hearing before an ALJ on October 18, 2011, during which he was represented by an attorney.   Tr. 12, 31-101.   Plaintiff, Plaintiff's mother, Zdenka Krejci, and vocational expert ("VE") Robert Lessne testified at the hearing.   Tr. 31-101.

On September 20, 2013, the ALJ issued a decision finding that Plaintiff was not disabled and denied his claim.   Tr. 12-23.   The ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.   Tr. 14.   At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 15, 2011, the alleged onset date. *Id.*   At step two, the ALJ determined that Plaintiff has the severe impairments of hypertension and dysesthetic pain syndrome.   *Id.*   At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. . . ."   Tr. 15.

Taking into account the effects of all of Plaintiff's impairments, severe and nonsevere, the ALJ determined that Plaintiff has the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can sit up to six hours in an eight-hour day, stand up to six hours and walk up to two hours in an eight-hour day, can frequently lift and carry up to twenty pounds, occasionally lift and carry up to fifty, can frequently use his hands overhead, reaching in all directions, as well as to handle, finger and feel, can use both feet frequently, can occasionally climb ramps and stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch and crawl, can frequently have exposure to humidity and wetness, fumes, odors, dusts and gasses, extreme temperatures, and vibrations, can occasionally have exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, and can be exposed to moderate noise levels such as in an office. He also has the ability to perform simple, routine, competitive, repetitive tasks on a sustained basis, with no more than simple decision making required, and must work essentially alone with only occasional supervision.

Tr. 15-16.   The ALJ found that Plaintiff's impairments are not as severe or limiting as alleged, and his statements concerning the intensity, persistence and limiting effects of the symptoms are not fully credible for reasons explained in the opinion. Tr. 17.   The ALJ found that Plaintiff was unable to perform his past relevant work as a bus rental clerk, diesel bus mechanic, bus driver or parcel/post clerk because such work exceeds the RFC of light work with additional limitations.   Tr. 21. Considering the Plaintiff's age, education, work experience and RFC, the ALJ held there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as addresser, sandwich board carrier and marker.   Tr. 21-22. Thus, the ALJ found Plaintiff was not disabled and denied his claim.   Tr. 22.

Following the ALJ's decision, Plaintiff filed a request for review by the Appeals Council which was denied.   Tr. 1-6.   Accordingly, the ALJ's September 30, 2013

decision is the final decision of the Commissioner.   Plaintiff filed an appeal in this Court on March 24, 2015.   Doc. 1.   Both parties have consented to the jurisdiction of the United States Magistrate Judge, and this matter is now ripe for review.   Doc. 14.

### III.    Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to either result in death or last for a continuous period of not less than twelve months.    42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).   The Commissioner has established a five-step sequential analysis for evaluating a claim of disability.   *See* 20 C.F.R. §§ 404.1520; 416.920.   The Eleventh Circuit has summarized the five steps as follows:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy."

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (citing 20 C.F.R. §§ 416.920(a)(4), (c)-(g), 416.960(c)(2); *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011)). The claimant bears the burden of persuasion through step four; and, at step five, the burden shifts to the Commissioner.  *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).   The Eleventh Circuit has noted that the Commissioner's burden at step five is temporary, because "[i]f the Commissioner

- 4 -

presents evidence that other work exists in significant numbers in the national economy, 'to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists.'" *Atha*, 616 F. App'x at 933 (citing *Doughty v. Apfel*, 245 F.3d 1274, 1278 n. 2 (11th Cir. 2001)). The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).

The Eleventh Circuit recently has restated that "[i]n determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings." *Hunter v. Soc. Sec. Admin., Comm'r,* 808 F.3d 818, 822 (11th Cir. 2015) (citing *Black Diamond Coal Min. Co. v. Dir., OWCP,* 95 F.3d 1079, 1082 (11th Cir. 1996)). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a

contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision."  *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).  It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses.  *Lacina v. Commissioner*, 2015 WL 1453364, at *2 (11th Cir. 2015) (citing *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971)).

## IV.   Discussion

### a. Whether the ALJ properly determined at step two that Plaintiff's traumatic brain injury is not a medically determinable impairment.

Plaintiff first states that the ALJ committed reversible error by finding that Plaintiff's TBI was not a medically determinable impairment or MDI.  Doc. 18 at 7. Further, Plaintiff argues that this error was compounded because as a result, the ALJ did not consider any effects from this condition in determining Plaintiff's RFC or evaluating his credibility.  *Id.*  Plaintiff further argues that "[e]ssentially, the ALJ found that [TBI] was not a legitimate condition . . . ."  *Id.*  The Commissioner responds that the ALJ properly found Plaintiff's TBI was not a medically determinable impairment in this case, and substantial evidence supports the ALJ's decision.  Further, the Commissioner asserts that the ALJ accounted for any

limitations in his mental RFC finding.   Doc. 19 at 3-8.   The Commissioner further states that even assuming Plaintiff's TBI was an MDI "at some point," the evidence falls short of satisfying Plaintiff's burden to show that the impairment lasted or was expected to last at least twelve consecutive months.   *Id.* at 6.   In his reply brief, Plaintiff correctly points out that the ALJ did not determine Plaintiff's TBI was not an MDI on a durational basis, and this Court may only uphold the ALJ's decision on the same bases articulated in the agency's order, citing *Baker v. Comm'r of Soc. Sec.*, 384 F. App'x 893, 896 (11th Cir. 2010).   Further, Plaintiff states substantial evidence shows Plaintiff's condition did meet the durational requirement.   Doc. 22 at 2. Finally, Plaintiff notes that, because the ALJ did not consider Plaintiff's TBI to be a medically determinable impairment, he was precluded under the Social Security regulations from considering the impact of this impairment on the RFC.   *Id.* at 3; citing 20 C.F.R. §§ 404.1529(b), 415, 929(b).   Because the Court finds, after review of the entire record, that substantial evidence does not support the ALJ's determination that Plaintiff's TBI is not a medically determinable impairment, and thus it is not clear whether the ALJ considered the mental or physical limitations from Plaintiff's TBI in his RFC analysis, remand is required.

The Social Security Regulations explain what is needed for a claimant to show an impairment:

> Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.

20 C.F.R. § 404.1508.   The impairment must be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.   20 C.F.R. § 404.1527.   The "impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   *Id.*

Here, in his step two analysis, the ALJ addressed Plaintiff's allegation of disability due to traumatic brain injury.   Tr. 15.   The ALJ accurately stated that a medically determinable impairment may not be established on the basis of an individual's allegations regarding his symptoms, but instead must be established by medical evidence consisting of signs, symptoms and laboratory findings.   *Id.* (citing 20 C.F.R. § 404.1508; SSR 96-4p).   Citing to § 404.1508, the ALJ properly noted that "[s]igns are anatomical, physiological, or psychological abnormalities that can be observed apart from an individual's statements regarding symptoms, and they must b[e] shown by medically acceptable clinical and diagnostic techniques."   Tr. 15.   The ALJ then discussed that the medical evidence and records in Plaintiff's case did not include such signs, symptoms or laboratory findings indicating that Plaintiff suffered from traumatic brain injury.   *Id.*   As discussed herein, substantial evidence does not support this finding of the ALJ.

Plaintiff argues that in determining that Plaintiff's TBI was not a MDI, the ALJ relied exclusively on an opinion of Jonathan Jagid, M.D., who examined Plaintiff in a one-time evaluation in June 2011.   Doc. 22 at 2.   Although the ALJ noted that

Plaintiff had been in a motorcycle accident in January 2011, it is true he discussed only Dr. Jagid's opinion in the step two portion of the decision.   Tr. 15.

Dr. Jagid examined Plaintiff on June 21, 2011 on referral from Dr. Allan D. Levi about six months after Plaintiff's accident.   Tr. 600.   He noted that Plaintiff had spent approximately three months in the hospital following his accident and had initially been on a ventilator for a few days.   *Id.*   Dr. Jagid stated it was "unclear" as to what Plaintiff's "acute intracranial injury" consisted of, however:

> it appeared that he had multiple facial lacerations, particularly over the right side of the forehead and the area of the temple including a laceration to his right ear. He made a full recovery, but since that accident *has been having very severe [frequent] headaches which he states have not improved. . . .* He describes the headaches essentially as a dull headache for most of the day but every 2 or 3 weeks, he has a massive headache as he describes it which is 10/10 with primarily fullness of the right side of the forehead into the cheek area and states that he has to take significant amounts of Tylenol to relieve.

*Id.* (emphasis added).   Dr. Jagid reported that Plaintiff was on a number of medications, including Inderal,[2] Tramadol,[3] Enalapril,[4] Tegretol,[5] Neurontin[6] and

---

[2] "Inderal (propranolol) is a beta-blocker. Beta-blockers affect the heart and circulation (blood flow through arteries and veins).Inderal is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions." https://www.drugs.com/inderal.html.

[3] "Tramadol is a narcotic-like pain reliever. Tramadol is used to treat moderate to severe pain.   The extended-release form of tramadol is for around-the-clock treatment of pain.   This form of tramadol is not for use on an as-needed basis for pain." https://www.drugs.com/search.php?searchterm=tramadol&a=1.

[4] "Enalapril is an ACE inhibitor. ACE stands for angiotensin converting enzyme. Enalapril is used to treat high blood pressure (hypertension) in adults and children who are at least 1 month old. Enalapril is also used to treat congestive heart failure in adults." https://www.drugs.com/search.php?searchterm=enalapril.

[5] "Tegretol (carbamazepine) is an anticonvulsant. It works by decreasing nerve impulses that cause seizures and pain.   Tegretol is used to treat certain types of seizures (partial, tonic-clonic, mixed).   Tegretol is also used to treat nerve pain such as trigeminal neuralgia and glossopharyngeal neuralgia." https://www.drugs.com/tegretol.html.

[6] "Neurontin (gabapentin) is an anti-epileptic medication, also called an

Tylenol as needed.   *Id.*   During the examination, Plaintiff denied dizzy spells, tremors, memory loss, trouble concentrating, seizures, stress or confusion, but admitted to depression.   Tr. 601.   Dr. Jagid was unable to review the actual images of the prior CT scans and MRIs performed, as the family did not bring them; however, he noted from readings the imaging studies that Plaintiff's small subdural hygromas had completely resolved and there was no evidence of any basilar skull fractures.   *Id.* Dr. Jagid acknowledged Plaintiff had sustained a *moderately severe head injury*, yet opined he had made a "very nice recovery."   *Id.* (emphasis added).   Dr. Jagid concluded:

> My impression at this time is that this young individual who sustained what sounds like *a moderate severity head injury* as a result of a motorcycle accident spent an extended period of time in an outside hospital. *According to the reports that I can put together what appeared that he made a very nice recovery, but has been left with very significant headaches.* It appears to be after careful questioning [a] component of this which may be related to some of the severe lacerations that he had over his right temporal area, ear and cheek which may be creating some sort of dysesthetic pain syndrome. He states that periodically he has noticed some what he describes as wetness around his nasal area, but no overt dripping of fluid. This has resolved as he states it is not happening currently. Additionally, his headaches that he complains of do not appear to be positional in the sense that it would not come on when he is standing upright, so this would be inconsistent with a cerebrospinal fluid leak syndrome. In any event, l have prescribed him Imitrex.[7] In the interim, they will get me the imaging studies, so that I can review them myself to determine whether or not there has been

---

anticonvulsant. Gabapentin affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain." https://www.drugs.com/neurontin.html.

[7] "Imitrex (sumatriptan) is a headache medicine that narrows blood vessels around the brain. Sumatriptan also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound, and other migraine symptoms.   Imitrex is used to treat migraine headaches with or without aura in adults. Sumatriptan will only treat a headache that has already begun. It will not prevent headaches or reduce the number of attacks." https://www.drugs.com/imitrex.html.

anything that might have been missed. In the absence of that, it would be my recommendation that he seek the medical attention of an expert in pain management as he may require this area of expertise to control his pain. . . .

*Id.*

Other medical records of Plaintiff's head injury and its effects include the initial CT scan of Plaintiff's head immediately following his accident on January 15, 2011, which showed mild traumatic brain injury (less than 30 minutes loss of consciousness) and a low Glasgow coma score ("GCS") of 7,[8] a repeat CT scan three days later on January 18, 2011 showed no intracranial mass effect, hemorrhage or acute hydrocephalus. Tr. 270. An MRI of Plaintiff's head taken on January 22, 2011 indicated a probable grade 1 diffuse axonal injury,[9] scant intraventricular hemorrhage, no evidence of hydrocephalus and small bilateral frontal subdural hygromas. Tr. 275.

In an examination on January 23, 2011 by Dr. Dean D. Lin, M.D., NRS, Dr. Lin noted that while Plaintiff was confused and easily arousable, his current GCS was 14; and an MRI of the brain and the CT scans of his head performed earlier in

---

[8] "The Glasgow Coma Scale, developed in 1974 by Jennett and Teasdale, is used by many clinicians as an initial assessment of neurological function in head injury patients. It involves scoring neurological function by assigning points for eye, verbal and motor functions, with the highest possible score of 15 being completely normal, and the lowest possible score of 3 consistent with coma or death. It is considered by many to be the best means of predicting long-term outcomes in patients affected by diffuse axonal injury (superior to findings on CT or MRI). *In general, patients with a GCS score of 8 or less immediately after injury have a poor prognosis for complete recovery.*" http://www.calshipleymd.com/diffuse-axonal-injury-in-traumatic-brain-injury/ (emphasis added).

[9] Diffuse Axonal Injury is a potentially severe form of TBI, and is the underlying cause of injury in 50% of TBI patients requiring hospitalization. Diffuse Axonal Injury results from sudden changes in velocity of the head. Motor vehicle accidents (MVAs) are a frequent example of such situations. http://www.calshipleymd.com/diffuse-axonal-injury-in-traumatic-brain-injury/.

the month were negative for acute intracranial process.   Tr. 278.   He further noted that no surgical intervention was planned, and he recommended continuing "supportive care."   Tr. 279.   Dr. Lin also opined that Plaintiff would need rehabilitation for cognitive improvement, and recommended observation and re-imaging if his neurological status declined.   Tr. 279.   Although the ALJ discussed the hospital records outlined above, he did not discuss them in relation to his determination whether Plaintiff's TBI was an MDI.[10]   Tr. 17.

Following discharge from the hospital in February, Plaintiff saw his primary care physician, Dr. Peter Schreiber, D.O., on March 18, 2011, who assessed that Plaintiff had cognitive and functional deficits "following traumatic brain injury."   Tr. 510.   A CT scan performed in March 2011, which was compared to Plaintiff's scans on January 18 and 22, 2011, showed resolution of the hygromas, no acute internal hemorrhage and no hydrocephalus.   Tr. 17, 853.

In a visit on April 4, 2011 to Ivan L. Mazzorana, Jr., M.D., a board-certified psychiatrist, Plaintiff was diagnosed with traumatic brain injury with depression. Tr. 511.   In a return visit to Dr. Lin on May 2, 2011, in which Plaintiff complained of nasal drainage and headaches, Dr. Lin discussed that a CT scan of Plaintiff's head taken on April 18, 2011 revealed no evidence of the subdural hygromas.   Tr. 595. He observed that there appeared to be some sinus disease, but did not see any fluid in any of Plaintiff's sinuses, indicating there was not a post-head injury spinal fluid leak.   *Id.*   Dr. Lin explained that Plaintiff's postconcussive syndrome, including

---

[10]   The ALJ erroneously noted the consultation with Dr. Lin was in March 2011, rather than January 2011.   Tr. 17.

headache, dizziness and gait difficulty, may persist for several months, especially since Plaintiff has had multiple head injuries in the past. *Id.* Indeed, as discussed in more detail below, neurologist Dr. Edward Davis, D.O., opined after treatment of Plaintiff from August 22, 2011 through December 14, 2011, that Plaintiff still was experiencing severe and chronic headaches in spite of increases in medications, disequilibrium, short-term memory, traumatic encephalopathy, [11] post-traumatic cephalgia (headaches) with vascular flavor, and a history of reported seizure activity. Tr. 925-941.

Despite medical evidence to the contrary up to at least one year after Plaintiff's accident that he still was experiencing severe medical issues from the multiple diagnoses of TBI he received, the ALJ's determination that Plaintiff's TBI was not a medically determinable impairment simply is not supportable by substantial evidence in the record. Although the Commissioner points out that the evidence may not satisfy the twelve-month durational requirement (Doc. 19 at 6), the Court is not convinced this is the case. Furthermore, as noted by Plaintiff, the ALJ did not reject Plaintiff's TBI as an MDI on a durational basis; thus, it would be erroneous for the Court to uphold the ALJ's opinion on that basis. *Baker*, 384 F. App'x at 896. Even Dr. Jagid, on whose opinion the ALJ appeared to primarily base his determination, acknowledged that Plaintiff had an acute intercranial injury and very severe headaches that had not improved and for which Dr. Jagid prescribed additional

---

[11] "Encephalopathy is a broad term used to describe abnormal brain function or brain structure. . . . The abnormality may be transient, recurrent, or permanent. The loss of brain function may be reversible, static and stable, or progressive with increasing loss of brain activity over time." http://www.emedicinehealth.com/encephalopathy/article_em.htm.

medication, in addition to the myriad of other strong medications Plaintiff was taking to address his headaches and seizures.   Tr. 600-01.   In light of these facts, Dr. Jagid's opinion that Plaintiff had made a "very nice recovery" is not supportable.   Tr. 601.   The record shows that as late as December 2011, Plaintiff's headaches still had not resolved, and his medications were being adjusted.   Tr. 927.

Because substantial evidence does not support the ALJ's decision that Plaintiff's TBI is not an MDI, and it is not clear that the ALJ considered the mental or physical limitations of Plaintiff's TBI in his RFC assessment, as he was not required to do so if it was not determined to be an MDI, the Court finds remand is proper.   On remand, the Commissioner should direct the ALJ to reconsider the medical evidence in light of whether Plaintiff's TBI was an MDI, and, if so, determine what impact the impairment has on Plaintiff's ability to work.

> b. *Whether the ALJ properly evaluated Plaintiff's treating and consultative physicians' opinions.*

Plaintiff next argues that the ALJ committed reversible error because he failed to provide a legally sufficient basis for rejecting the opinion of Plaintiff's treating neurologist, Edward David, D.O., and consultative psychologist, Claudia Zsigmond, Psy.D.   Doc. 18 at 11.   The Commissioner responds that, contrary to Plaintiff's contentions, the ALJ properly evaluated these opinions under the proper legal standards.   Doc. 19 at 11-15.

When determining how much weight to afford an opinion, the ALJ considers whether there is an examining or treatment relationship and the nature and extent thereof; whether the source offers relevant medical evidence to support the opinion;

consistency with the record as a whole; the specialization of the source, if any; and any other factors that tend to support or contradict the opinion.   20 C.F.R. § 404.1527(c)(1)-(6).   Under the regulations, opinions of treating sources usually are given more weight because treating physicians are the most likely to be able to offer detailed opinions of the claimant's impairments as they progressed over time and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(c)(2).   Medical source opinions may be discounted, however, when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole.   SSR 96-2p; *Crawford*, 363 F.3d at 1159-60.

Accordingly, "[a]n ALJ must give a treating physician's opinion substantial weight, unless good cause is shown."   *Castle v. Colvin*, 557 F. App'x 849, 854 (11th Cir. 2014) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004)); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Sabo v. Chater*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996).   "Good cause exists when the '(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"   *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).

If the opinion of a treating physician as to the nature and severity of a claimant's impairment is supported by acceptable medical evidence and is not inconsistent with other substantial evidence of record, the treating physician's

opinion is entitled to controlling weight.    SSR 96-2p; 20 C.F.R. § 404.1527(c).    By contrast, if the ALJ does not afford controlling weight to a treating physician's opinion, he must clearly articulate the reasons for doing so.    *Winschel*, 631 F.3d at 1179.    Although the regulations require that the ALJ consider all factors set forth in 20 C.F.R. § 404.1527(c), the ALJ is not required to expressly address each factor so long as he demonstrates good cause to reject the opinion.    *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

Dr. Davis treated Plaintiff from August 2011 through December 2011.    Tr. 925-941.    Plaintiff was referred to Dr. Davis from Dr. Lin for evaluation on August 22, 2011.    Tr. 932.    Dr. Davis noted that at that point in time Plaintiff was complaining of low grade daily headaches, punctuated by severe right-sided headaches occurring once or twice per week and lasting up to a day and a half.    *Id.* Plaintiff also complained of problems with disequilibrium and short-term memory loss since the accident.    *Id.*    Plaintiff's neurological examination showed that his mental status was alert, and he was oriented to person, place, date, and time.    His speech was fluent and he showed no hemineglect.[12]    *Id.*    Dr. Davis opined that Plaintiff suffered from traumatic encephalopathy, posttraumatic cephalgia with vascular flavor and a history of reported seizure activity post trauma.    *Id.*    He planned to request an EEG and adjust Plaintiff's medications.    *Id.*    On August 26, 2011, he administered an EEG on Plaintiff, which was abnormal based on left

---

[12] "Hemineglect is an abnormality in attention to one side of the universe that is not due to a primary sensory or motor disturbance." http://www.neuroexam.com/neuroexam/content.php?p=10.

temporal sharp waves consistent with a focal epileptiform disorder.   Tr. 935.   Dr. Davis noted Plaintiff currently was taking 50 mg daily of Topamax[13] and remained on 200 mg of Epitol.[14]   Tr. 931.   He noted Plaintiff continued to have headaches and tried Maxalt,[15] which Dr. Davis noted helped.   *Id.*   He again diagnosed Plaintiff with post-traumatic seizure disorder and headaches and post-traumatic encephalopathy.   *Id.*   Dr. Davis noted:   "I believe the latter precludes [Plaintiff] from returning to work as a mechanic."   *Id.*   He increased the Topamax to 100 mg to improve Plaintiff's headaches, and Plaintiff would continue with Maxalt as needed and Epitol in the short term.   *Id.*   Dr. Davis saw Plaintiff again on October 14, 2011, during which he indicated that Plaintiff's headaches were worsening despite the increase in Topamax, but noted they were "temporally related to legal issues with his wife."   Tr. 930.   He observed that Plaintiff had been out of work since his accident in January, and opined that Plaintiff "quite likely will never return to meaningful employment," noting that Plaintiff was in the process of applying for Social Security disability.   *Id.*   He further noted that Plaintiff had a history of post-traumatic seizures, but was seizure free on 200 mg of Epitol twice daily.   *Id.*   Dr. Davis planned to discontinue Plaintiff's Topomax and substitute 50 mg of Nortriptyline to

---

[13] "Topamax (topiramate) is a seizure medicine, also called an anticonvulsant." https://www.drugs.com/search.php?searchterm=Topamax.

[14] "Epitol (carbamazepine) is an anticonvulsant. It works by decreasing nerve impulses that cause seizures and pain.   Carbamazepine is used to treat seizures and nerve pain such as trigeminal neuralgia and diabetic neuropathy." https://www.drugs.com/mtm/epitol.html.

[15] "Maxalt (rizatriptan) is a headache medicine that narrows the blood vessels around the brain. Rizatriptan also reduces substances in the body that can trigger headache pain, nausea, sensitivity to light and sound, and other migraine symptoms. Maxalt is used to treat migraine headaches." https://www.drugs.com/search.php?searchterm=Maxalt&a=1.

help with Plaintiff's headaches and insomnia.  *Id.*  Plaintiff was to continue the Epitrol for seizure prevention, and return in one month.  *Id.*  On November 21, 2011, Plaintiff reported "substantial improvement" in his headaches with the Nortriptyline, but not with his insomnia.  Tr. 929.  He was seizure-free, but had taken a fall in the previous month.  *Id.*  Dr. Davis continued Plaintiff on the same medications, but switched the Nortriptyline to daytime to minimize insomnia.  *Id.* In the next visit to Dr. Davis on December 7, 2011, Plaintiff reported dizziness since his last visit, which Dr. Davis attributed to switching the Nortriptyline from evening to days.  Tr. 928.  He told Plaintiff to hold off taking the medication for seven days. *Id.*  In a December 14, 2011 visit, Plaintiff reported his dizziness has resolved but his headaches returned, which Dr. Davis had predicted.  Tr. 927.  Dr. Davis substituted Amitriptyline instead, and told Plaintiff to return for a follow-up in one month.  *Id.*

There are no other medical records from Dr. Davis until he completed a medical source statement dated June 28, 2013 concerning organ brain syndrome for Plaintiff's Social Security disability claim, a year and a half later.  Tr. 972-74.  In the statement, Dr. Davis found that Plaintiff had mild restriction in activities of daily living and difficulty in maintaining social functioning, and no deficiencies of concentration, persistence or pace or episodes of decompensation.  Tr. 972.  In contrast, Dr. Davis opined that Plaintiff had marked impairments in his ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, make simple work-related decisions, complete a normal

workweek without interruptions from psychologically-based symptoms, accept instructions from supervisors, maintain socially appropriate behavior or respond appropriately to changes in the work setting.   Tr. 972-73.   He also opined that Plaintiff had a medically documented history of chronic organic mental disorder of at least two years' duration that has caused more than a minimal limitation in his ability to do basic work activities.   Tr. 972.   There is no indication in the record that Dr. Davis had examined Plaintiff since his last visit in December 2011.

Based on these opinions discussed by the ALJ, the ALJ gave Dr. Davis' opinions little weight.   He noted some of the answers circled by Dr. Davis concerning the organic brain syndrome "appear to require confirmation of psychological or mental impairments which is not supported by the medical evidence of record of claimant's treatment history." Tr. 20.   The ALJ noted these opinions also were internally inconsistent with Dr. Davis' own opinions, the opinion of Dr. Jagid, diagnostic testing showing Plaintiff's hygromas and post-concussive symptoms had completely resolved and that his headaches were controlled with medication.   *Id.* The ALJ further noted that Dr. Davis' opinion that Plaintiff could not return to his work was based on Plaintiff's "subjective complaints," and in any event, such issues bearing on whether Plaintiff is disabled is reserved to the Commissioner.   *Id.*, citing SSR 96-5p.

Although the Court finds the ALJ's articulated reasons for giving little weight to Dr. Davis' opinions, particularly to his 2013 opinion that Plaintiff is disabled, which

decision is reserved to the Commissioner,[16] are supported by substantial evidence, on remand after reconsidering whether Plaintiff's TBI is a medically determinable impairment, the ALJ should reconsider whether he gave the proper weight to the opinions of Plaintiff's treating physician.

Plaintiff next alleges the ALJ "ignored" the opinion of consulting psychologist Dr. Zsigmond, who examined Plaintiff in July 2011.   Doc. 18 at 13-14.   Dr. Zsigmond reported that Plaintiff denied any history of mental health evaluations or treatment or having ever been psychiatrically hospitalized or attempting suicide.   Tr. 611. Plaintiff had no history of substance abuse or family history of mental health or substance abuse issues.   *Id.*   While Dr. Zsigmond noted Plaintiff drives only on a very limited basis due to his vision and "cognitive problems," he was appropriately groomed and dressed with good basic functioning and hygiene, no prominent gait abnormalities or gross motor coordination problems.   Tr. 612.   She noted rapport was easy to establish.   *Id.*   Dr. Zsigmond further noted that Plaintiff did not evidence symptoms of psychosis and had adequate recall of remote events; however, his mother, who was present during part of the evaluation, had to provide many details following Plaintiff's accident.   *Id.*   Dr. Zsigmond noted that Plaintiff was

---

[16] SSR 96-5p; *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) (noting "[t]he regulation in 20 C.F.R. § 404.1527 provides that although a claimant's physician may state he is 'disabled' or 'unable to work' the agency will nevertheless determine disability based upon the medical findings and other evidence"); 20 C.F.R. § 404.1527(d)(1).   Such an opinion by a medical source does not mean that the Commissioner will determine that a claimant is disabled and, accordingly, the ALJ need not afford such opinion any special significance.   20 C.F.R. § 404.1527(d)(1) & (3).   As such, the ALJ here was not required to afford any particular weight to Dr. Davis' opinion that Plaintiff was unable to work, particularly because when completing the medical source statement in June 2013, Dr. Davis had not treated Plaintiff since December 2011.   Tr. 925, 927.

unable to spell the word "world" backwards, which Dr. Zsigmond opined indicated limited attention and concentration.   *Id.*   She further noted his judgment and insight into his difficulties are limited "due to cognitive impairment."   *Id.*   Plaintiff had a "slightly blunted affect, however used humor at times and appeared in no acute mental distress."   *Id.*   Dr. Zsigmond noted Plaintiff's social life was "somewhat active visiting with friends 1-2 times a month [and his a]verage day consists of watching television, spending time o[n] Facebook, memory exercises and light housecleaning.   *Id.*   In conclusion, Dr. Zsigmond opined:

> His prognosis is guarded due to cognitive deficits residual to TBI in January of 2011. Based on presenting problems, cognitive disorders need to be further assessed. The evaluator recommends the following: Continue appropriate medical care. A memory assessment should be done in order to assess deficits residual to brain injury.

*Id.*

Contrary to Plaintiff's contention, the ALJ discussed Dr. Zsigmond's examination.   *See* Tr. 18.   Plaintiff is correct, however, that the ALJ failed to explain the weight, if any, he accorded her opinion.   See *id.*   This was error, because unless the ALJ gives controlling weight to Plaintiff's treating physician, which as noted he did not do here, the ALJ must explain the weight given to the opinions of other consultants, doctors or medical specialists.   20 C.F.R. § 404.1527(e)(2)(ii); *Vuxta v. Comm'r of Soc. Sec.*, 194 F. App'x 874, 877 (11th Cir. 2006).   Accordingly, remand is required concerning this issue as well.

> c. *Whether substantial evidence supports the ALJ's credibility determination*

Because the decision must be remanded for the reasons discussed above, and the ALJ's decision on remand concerning Plaintiff's TBI may affect the ALJ's credibility determination, the Court will not address this remaining issue. On remand, the ALJ also should reevaluate Plaintiff's credibility after determining whether Plaintiff's TBI is an MDI and consider any mental or physical effects from such impairment on Plaintiff's credibility.

## V.  Conclusion

ACCORDINGLY, for the reasons stated above, it is hereby

**ORDERED:**

1.    The decision of the Commissioner is **REVERSED,** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g); and;

2.    The Clerk of Court is directed to enter judgment accordingly, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on this 7th day of September, 2016.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record